UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
:
EVEREST NATIONAL INSURANCE :
COMPANY, *et al.*, :
:
      Plaintiffs, :    Civil Action No. 07-722 (JAP)
:
  v. :    **OPINION**
:
ROBERT SUTTON, *et al.*, :
:
      Defendants. :
:
_____ :

PISANO, District Judge.

    Plaintiffs Everest National Insurance Company and Everest Reinsurance Company (together, "Everest" or "Plaintiffs") bring this breach of contract action against Robert Sutton, WK Capital Advisors, Inc., Centrix Consolidated, LLC and Centrix Capital Management, LLC (collectively, "Defendants"). Presently before the Court are two motions by Plaintiffs. The first is a motion to dismiss Defendants' counterclaims. The second is a motion for partial summary judgment seeking the enforcement of certain guaranties executed by Defendants. The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth herein Plaintiffs' motion for summary judgment is granted, and Plaintiffs' motion to dismiss is granted in part and denied in part.

**I.    BACKGROUND**

    This case arises out of a program developed by Centrix Financial LLC ("Centrix"),[1] a

---

[1] Centrix is not a party to this litigation.

Colorado limited liability company, involving sub-prime automobile loans. Defendant Robert Sutton was the Chairman and CEO of Centrix. Declaration of Robert Sutton ("Sutton Decl.") at ¶ 3. Prior to filing for bankruptcy in 2006, Centrix was in the business of underwriting and servicing sub-prime automobile loans. *Id.* at ¶ 4. Centrix would originate the loans and place them with third party lenders, primarily credit unions, and would then service the loans for these lenders. *Id.*

Centrix developed what was known as its Portfolio Management Program ("PMP"), through which Centrix arranged for third-party insurers to extend two types of insurance to protect the lenders -- default protection insurance ("DPI"), which protected lenders from deficiency loan balance losses when a resulting from a repossessed motor vehicle; and vendor single interest insurance, which provided protection to lenders in the event a repossessed motor vehicle was damaged or in the event a vehicle could not be recovered from a defaulted borrower. *Id.* at ¶ 5.

From 1998 until August 2003, DPI coverage was provided under the program by Lyndon Insurance Group, Inc. ("Lyndon"), not a party to this case. *Id.* at ¶ 7. However, late in 2002, Centrix began to take steps to replace Lyndon as the DPI provider. *Id.* In October 2002, Centrix initiated negotiations with Plaintiff Everest National Insurance Company ("Everest") with the goal of having Everest replace Lyndon as the DPI insurer for the PMP. *Id.* According to Defendants, by November 2002 negotiations between the parties "appeared to be going well," and Defendants believed "a deal would be struck in late 2002, with Everest to begin providing DPI coverage in early 2003." *Id.* at ¶ 9.

In early 2003, Centrix was advised that Lyndon would no longer provide DPI coverage on

Centrix-originated loans and, as such, Centrix would be without a DPI provider in or about mid-2003.  *Id.* at ¶ 10-11.  According to Defendants, DPI was critical to its PMP and, therefore, critical to Centrix's ongoing business.  Sutton communicated to Everest that Centrix would be losing its DPI provider as of mid-2003 and also communicated to Everest that DPI coverage was a critical part of Centrix's continued business.  *Id.*

According to Defendants, "shortly after Sutton communicated to Everest the necessity of having DPI coverage in place by mid-2003, Everest "insisted on" conducting extensive due diligence of the PMP during its negotiations with Centrix.  *Id.* at ¶ 12.  Sutton states that he became increasingly concerned about finalizing a deal with Everest "[a]s the first half of 2003 progressed," and he called Everest many times to inquire about the status of the negotiations.  *Id.* at ¶ 13; see also Declaration of Roland Anderson ("Anderson Decl.") at ¶ 12 ("As 2003 progressed, Centrix was eager to finalize the terms of the deal with Everest, in light of the fact that Lyndon would no longer be providing DPI coverage as of the middle of the year.")  Sutton states that he was told several times that the parties were "just weeks away from finalizing a deal."  Sutton Decl. at ¶ 12.  Subsequently, on April 16, 2003, the parties executed a letter of intent, which allegedly set forth the parties intention to execute a Program Administrator's Agreement ("PA Agreement").[2]  Ultimately, the negotiations between the parties culminated in PA Agreement was executed on June 6, 2003, which set forth the rights and obligations of the parties in connection with the underwriting and servicing of sub-prime loans and the DPI policy.  Declaration of Anthony Del Guercio ("Del Guercio Decl.") at Ex. B (PA Agreement).

---

[2]Defendants have not provided an executed copy of this letter of intent; and unexecuted copy is attached to the Declaration of Michael Connelly at Ex. 7.

The PA Agreement stated that Everest had "concerns regarding the frequency of loan defaults and the corresponding impact upon [Everest's] loss experience." PA Agreement at 1. It further states that Centrix "assured [Everest] that the loan default frequency should not be a concern," and, "as evidence of [Centrix's] confidence in its finance contract underwriting and servicing abilities, [Centrix] requested that [Everest] consider reinsuring [the DPI policy] with Founders [Insurance Company Limited] ("Founders")," which was a Bermuda-based company that was also owned by Sutton. *Id.* Everest "agreed to consider [Centrix's] request to reinsure such policies with Founders," but noted that it had "concerns regarding Founders['] capitalization." *Id.* at 2. As such, as an incentive for Everest to enter into the PA Agreement, Centrix "and certain of its affiliates and controlling shareholders have offered to guarantee that Founders will be able to meet its obligations under such a reinsurance agreement." *Id.* The PA Agreement stated that Everest was "willing to issue such policies, to enter into this Agreement, to reinsure such policies with Founders based upon the representation and guarantees of [Centrix] and the other guarantors herein." *Id.* Consequently, the PA Agreement contained a provision captioned "Agreement to Guarantee Founders' Reinsurance Obligations" which stated:

> [Centrix], Wilshire Partners, and Robert Sutton, all of whom have executed this Agreement, agree to guarantee the obligations of Founders, which guarantee will be set forth with greater particularity in a separate guarantee of the reinsurance agreement between [Everest] or one of its affiliates, and Founders. The execution of such reinsurance agreement and guarantee is a condition precedent to the effectiveness of this Agreement and [Centrix's] authority hereunder.

*Id.* at 30. Defendant Sutton signed the PA agreement on behalf of Centrix, Wilshire Partners and himself individually.

Consistent with the representations in the PA Agreement, Everest and Founders entered

into an Excess of Loss Reinsurance Agreement effective January 1, 2004 ("Reinsurance Agreement"). Del Guercio Decl. at Ex. C. Under the Reinsurance Agreement, Founders reinsures losses incurred by Everest arising under the DPI Policy in excess of a specified amount. As also set forth in the PA Agreement, Sutton (individually and as owner of WK Capital Advisors Inc.), Wilshire Partners (by Sutton), and Centrix Capital Management LLC (by Sutton) (collectively, the "Guarantors") executed guaranties in favor of Everest securing the obligations of Founders under the Reinsurance Agreement. Specifically, the guaranties provided that each of the Guarantors "irrevocably, absolutely and unconditionally" guaranteed:

> (a) the prompt payment by Founders, as and when due and payable of all amounts now or hereafter owing by Founders to [Everest] under the Reinsurance Agreement or in connection with the Reinsured Policy, including any renewals, extensions and modifications thereof;
> (b) all of the obligations of Founders to [Everest] under the Reinsurance Agreement and the Reinsured Policy; and
> (c) any and all expenses, including reasonable attorneys fees, incurred by [Everest] in enforcing their rights under this Guaranty, PA Agreement, the Reinsured Policy or the Reinsurance Agreement.

*Id.* at Ex. D (Guaranties).

There appears to be no dispute that in connection with an arbitration between Everest and Founders related to the Reinsurance Agreement, an arbitration panel ordered Founders to post security in the amount of $70 million.[3] Del Guercio Decl. Ex. L, M (Interim and Final Orders of Arbitration Panel). Founders failed to comply with this Order. By way of the instant motion, Everest seeks partial summary judgment ordering the Guarantors, under the terms of the Guaranties, to satisfy Founders's obligation to post the security of $70 million in favor of

---

[3]The action seeking to confirm this arbitration award, Civil Action No. 08-808 (JAP) is currently before the undersigned.

Everest.

## II.     ANALYSIS

<u>A. Summary Judgment Standard</u>

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. In so presenting, the non-moving party may not simply rest on its pleadings, but must offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine

6

issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

Everest argues that it is entitled to judgment as a matter of law under the clear and unambiguous terms of the Guaranties. In response, Defendants argue that Everest's motion should be denied because (1) the PA Agreement and the Guaranties are not enforceable because they were executed under duress; and (2) Sutton was fraudulently induced to enter into the PA Agreement and the Guaranties.[4]

B. 12(b)(6) Standard

The Supreme Court clarified the standard for addressing a motion to dismiss under Rule 12(b)(6) in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969, 167 L.Ed.2d 929 (2007). The *Twombly* Court stated that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Id.* at 1964-65 (internal citations omitted); *see also Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir.2007) (stating that standard of review for motion to dismiss does not require courts to accept as true "unsupported conclusions and unwarranted inferences" or "legal conclusion[s] couched as factual allegation[s]" (internal quotation marks omitted)). Therefore, for a complaint to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "[f]actual allegations must be enough to raise a

---

[4]Defendants also argue that the motion for summary judgment is premature because discovery has not completed. However, as Plaintiff's correctly argue, even if further discovery allowed Defendants to prove every factual allegation they raise in opposition to Plaintiff's motion, the outcome of this motion would nevertheless be unchanged.

right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)...." *Twombly*, 127 S.Ct. at 1965 (internal citations and footnote omitted).

C.  Economic Duress

Defendants argue that the PA Agreement and the Guaranties were executed by Sutton under conditions of duress and, therefore, are unenforceable.  Specifically, Defendants allege that Everest, knowing that Centrix's DPI provider would be eliminating coverage, "lulled Sutton into believing that the material terms of a deal for DPI coverage were known and acceptable," and then "at the last minute, . . . sprung its non-negotiable demand for the Guaranties."  Def. Brf. at 18.  According to Defendants, at the time Everest "sprung" its demand, Everest allegedly knew that it was too late for Sutton to secure DPI coverage from another provider, and were allegedly aware that Sutton's failure to execute the Guaranties "would have wrecked certain and immeasurable damage on Centrix and its various corporate constituencies."  *Id.*

Everest, on the other hand, argues that even if all of the factual allegations raised by Defendants are true, they are insufficient on their face to rise to a level of "economic duress."  Everest asserts that it should not "be placed in a position where Guaranties of a multi-million dollar obligation are not enforced merely because Centrix chose to negotiation with but one insurer – and that insurer insisted on certain terms to the transaction."  Pl. Brf. at 17.

New Jersey's Supreme Court has noted that there are circumstances "under which economic pressure may invalidate an otherwise enforceable contract." *Continental Bank of Pa. v. Barclay Riding Acad., Inc.*, 93 N.J. 153, 175 (1983).  In *Continental Bank*, the court discussed the doctrine of economic duress as it applies to arm's length business transactions, and stated that

8

economic duress is generally comprised of two basic elements: (1) "[t]he party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and (2)[s]uch act or threat must be one which deprives the victim of his unfettered will." *Continental Bank*, 93 N.J. at 176 (citing 13 Williston on Contracts, § 1617 at 704 (3d ed.1970)).  However, the "decisive factor" in the economic duress analysis is the "wrongfulness of the pressure exerted."  *Id.* at 177; *see also Windsor Card Shops, Inc. v. Hallmark Cards, Inc.*, 957 F.Supp. 562, 570 (D.N.J. 1997).

In determining whether a party acted wrongfully, there is not a "simple formula" to apply, but certain general principles provide guidance:

> Where there is adequacy of consideration, there is generally no duress.... Whenever a party to a contract seeks the best possible terms, there can be no rescission merely upon the grounds of "driving a hard bargain." Merely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion.... Under this rule, the party exerting pressure is scored only for that for which he alone is responsible.

*Continental Bank*, 93 N.J. at 177 (citing Williston, *supra*, § 1617 at 708).  Importantly, the fact that one party may have the "upper hand" in negotiations does not automatically mean that the other party's agreement to a demand constitutes economic duress.  *See Windsor Card Shops, Inc. v. Hallmark Cards, Inc.*, 957 F.Supp. 562, 570 (D.N.J. 1997) (no economic duress in debt negotiation even though a creditor may have the "upper hand").

The Court finds that the undisputed facts (as well as the allegations by Defendants, if true) do not preclude granting summary judgment in favor of Everest with respect to enforcement of the Guaranties.  First, case law is clear that "driving a hard bargain" or "taking advantage of another's financial difficulty" are not duress.  *See Continental Bank*, 93 N.J. at 177.  Second,

9

and more importantly, to the extent that Centrix found itself under any sort of economic pressure to enter into a deal with Everest, such pressure was not the result of any action on the part of Everest, but rather the result of the Centrix's own business decisions. *See Continental Bank*, 93 N.J. at 177 (financial difficulty must be "contributed to or caused by the one accused of coercion"). Centrix initiated the negotiations with Everest in October 2002 because it desired to replace its current DPI carrier, Lyndon. Sutton Decl. ¶ 8. A few months later, in January 2003, Lyndon advised Centrix that it would be discontinuing coverage on Centrix-originated loans as of mid-2003. *Id.* ¶ 10. At this time, Centrix knew that without DPI coverage, its business "would be fatally injured." *Id.* ¶ 11. Centrix also knew that it had not yet struck a deal with Everest. Nevertheless, when faced with the possibility of losing its DPI coverage within a matter of months, Centrix apparently decided on an "all-its-eggs-in-one-basket" strategy and did not undertake any efforts to find alternate coverage in the event the negotiations with Everest were not fruitful. Even after Sutton communicated to Everest Centrix's need to have alternative DPI coverage in place by mid-2003 and Everest, nevertheless, insisted on conducting extensive due diligence of the PMP, Centrix still did not make any attempts to find another insurer. In fact, according to Defendants, it was not until May 23, 2003 – nearly 6 months after Centrix was informed that Lyndon would be discontinuing coverage – that Sutton "instructed Centrix personnel to begin investigating alternatives other than Everest." *Id.* at ¶ 38. It appears, however, that such a search did not begin in earnest until "some time in the latter half of 2003" when Sutton instructed Roland Anderson, the Executive Vice President of Insurance Operations at Centrix, to search for an alternative insurance provider. *Id.* ¶ 38. Unfortunately for Centrix, Roland informed Sutton that "the type of DPI coverage Centrix needed simply could not be

negotiated with any other insurance provider." *Id.* ¶ 38.  The facts are clear, therefore, that to the extent Centrix faced any sort of financial difficulties as a result of the potential loss of a DPI provider, it was not as a result of the actions of Everest.

Furthermore, it is of particular significance that Defendants have submitted no evidence that they, as distinct from Centrix, were subjected to economic duress.  *See Orix Credit Alliance, Inc. v. Bell Realty, Inc.*, 1995 WL505891 at *4 (Aug. 23, 1995 S.D.N.Y) (guarantor defendants could not prevail on economic duress defense where they "have not offered a shred of evidence in support of their contention that they, as distinct from [a separate defendant] were also subjected to economic duress").

The cases relied on by Defendants do not further their cause.  In *SS&O Corp. v. Twp. of Bernards Sewerage Auth.*, 62 N.J. 369 (1973), a developer sued to recover sewer connection fees paid pursuant to an agreement with a township sewer authority.  When the developer had initially protested the fees in the agreement, the authority had cancelled the developer's previously issued sewer permits.  The authority then, as a prerequisite for obtaining future permits, required the developer to enter into the agreement at issue "without any reservations and . . . to adopt a corporate resolution to the effect that it acted voluntarily and without compulsion or coercion on the part of the Authority.  *Id.* at 386.  The agreement was found to be a product of duress.

The Court finds *SS&O Corp.* to be inapposite for several reasons, the most significant being that the defendant in that case was a municipality that was "clothed with official authority." *Id.* at 387.  The developer in *SS&O Corp.* was obligated to deal with the municipality in order to complete the housing project.  In the instant case, there was no obligation on the part of Centrix to do business with Everest.

*Shanley & Fisher, P.C. v. Sisselman*, 215 N.J. Super. 200 (App. Div. 1987) and *Ross Systems v. Linden Dari-Delite, Inc.*, 35 N.J. 329 (1961) are similarly inapt.  *Sisselman* involved a threat by counsel to withdraw from representing its clients on the eve of trial unless the clients executed certain payment agreements regarding legal fees.  *Ross Systems* likewise involved parties already engaged in a business relationship as franchisor and franchisee.  Unlike *Sisselman* and *Ross Systems*, however, the instant case involves neither parties who were already engaged in an ongoing relationship nor the various interests implicated by such a relationship.

2.  Fraudulent Inducement

Defendants assert that they were fraudulently induced to enter into the PA Agreement and the Guaranties.  Specifically, in his declaration, Sutton alleges that Everest assured him that "the guaranty instrument was a 'mere formality,' that it 'would be torn up in a matter of months,' that it would never be enforced,' and that it was only 'window dressing' to appease Everest's Board of Directors.  Sutton Decl. at ¶ 21.  In reliance on these representations, Sutton executed the PA Agreement and the Guaranties.  *Id.* at ¶ 30.

Although Everest may dispute Defendants' factual allegations, they argue that even if the allegations were true, Defendants' claim of fraudulent inducement nevertheless fails because of the parol evidence rule.  The Court agrees.

"The parol evidence rule precludes the introduction of oral promises to alter or vary the terms of an integrated written agreement."  *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 436 (D.N.J. 1998) (quoting *Filmlife Inc. v. Mal "Z" Ena, Inc.*, 251 N.J. Super 570, 575 (App. Div. 1991).  While it is true, as Defendants assert, that the introduction of extrinsic evidence to prove fraud in the inducement is a well-recognized exception to the parol evidence rule, "a party may

12

not seek to contradict the express terms of a writing to avoid obligations he knowingly assumes." *Id.* Here, the parol evidence rule precludes proof of the allegations in Sutton's declaration that he was told by Everest that the agreements would never be enforced.

Third Circuit addressed an analogous situation in *Fr. Winkler KG v. Stoller*, 839 F.2d 1002 (3d Cir. 1988). In that case the plaintiff, Winkler, sought to recover on defendant Stoller's guarantee of certain promissory notes. Like Defendants here, Stoller alleged that "he was told that his guarantee was 'a mere formality' and that he would never be held personally liable on it," and Stoller argued that such representations constituted fraud. *Id.* at 1005. However, the Third Circuit found that the guarantee "embod[ied] the final written expression of the parties' agreement" and held that "proof in support of a guarantor's allegation that his indorsement was required only as a matter of form, and that it would never be enforced, is prohibited by the parol evidence rule." *Id.* at 1006. "To hold that parties made two contracts at the same time, one of which is in positive contradiction of the other is somewhat fantastic." *Id.* The court noted that the evidence "would do more than simply modify the notes' terms; it would utterly extinguish them." *Id.* (quoting *Reconstruction Finance Corporation v. Gohl*, 19 N.J. Misc. 545, 21 A.2d 693, 696 (Sup. Ct.1941). Consequently, the Third Circuit affirmed the trial court's entry of summary judgment against Stoller.

Likewise, in the instant case, the Court finds that the agreements at issue embody the final written expression of the parties' agreement. Indeed, each Guaranty expressly states that "This Agreement is intended by the parties as a final expression of their agreement, is intended as a complete statement of such agreement, and is in lieu of any oral understanding." Del Guercio Decl. at Ex. D. Because the alleged false promise by Everest directly contradicts the terms of

13

these written agreements, Defendants' allegations, even if true, are prohibited by the parol evidence rule.

D.  Reaffirmation

Further undercutting Defendants' argument that the agreements are unenforceable due to fraud and duress are Defendants' multiple reaffirmations of the original agreements.  Everest asserts that Defendants subsequently ratified and reaffirmed the Guaranties when (1) the parties executed a 2006 and Subordination Agreement[5] (Del Guercio Decl., Ex. I); (2) Defendants executed a 2006 Agreement, Release and Indemnity[6] between Sutton and several other entities (*Id.* at Ex. O), and (3) when Defendants filed a motion in the Centrix bankruptcy to enforce an asset purchase agreement, representing to the Court that Sutton "agreed to . . . reaffirm his personal guarantee of certain obligations to Everest (which could result in personal liability to Sutton of tens of millions of dollars) . . ." (*Id.* at Ex. G).  In each instance, Defendants acknowledged the existence and validity of the Guaranties.  However, Defendants claim that such statements cannot be considered reaffirmations or ratifications because they were made under the same conditions of fraud and duress as existed when Defendants originally entered into

---

[5]This agreement defined "Subordinated Indebtedness" to include all present and future obligations arising under the Guaranties from the corporate Guarantors, and these Guarantors agreed to modify their Guaranties in the Subordination Agreement.  A similar Subordination Agreement was executed in 2007.  Del Guercio Decl., Ex. J.

[6]This provides in the relevant part as follows:

In furtherance of the obligations of Sutton and Wilshire Partners as contained in the Sutton Guaranty and Wilshire Guaranty, respectively, Sutton and Wilshire Partners, jointly and severally, irrevocably, absolutely and unconditionally guarantee to agree to be sureties for all of the obligations and liabilities of Centrix and Founders under this Agreement, Release and Indemnity . . ." (Del Guercio Decl., Ex. O at 4-5)

the Guaranties three years earlier. The Court finds this allegation to be wholly without merit.

As to duress, "[a] party who claims duress has ratified the contract if, *after the duress is no longer being asserted*, the party does any of the following: (1) waits an unreasonable time to disaffirm the contract; (2) does any material act which assumes the transaction to be valid; or (3) deals with the subject matter of the contract as if the contract were still valid." *Bedewi v. Cedar Lake Property Owners, Inc.*, 2007 WL 2482679, *5 (N.J. Super. App .Div, Sept. 5, 2007) (emphasis added). Here, Everest asserts that Defendants waited an unreasonable time – three years – to disaffirm the contracts at issue and, further, engaged in conduct, described above, that "assum[ed] the transaction to be valid." *See id.* The Court agrees. Thus, such acts would ratify the contracts allegedly entered into under duress if the acts were done "after the duress is no longer being asserted." *Id.*

The Court finds that the conditions creating the alleged duress no longer existed when Sutton acknowledged the Guaranties. As discussed earlier, the duress claimed by Defendants allegedly resulted from Everest's alleged "eleventh hour" demand for the Guaranties. Defendants claim this demand was "sprung" at a time when Everest allegedly knew that Centrix would not have time to find an another DPI provider before Lyndon discontinued coverage. However, once Centrix had secured the DPI coverage with Everest, Defendants were no longer was "in a position where there were no alternatives to Everest and its eleventh hour demands." Def. Brf. at 18. Rather, Centrix was free to find alternative coverage and disaffirm the agreements. That it did not – or could not – is not the result of any coercion or duress on the part of Everest.

As to allegations of fraud, where a party "is cognizant of fraud or misrepresentation and

15

fails to promptly rescind the . . . agreement or transaction, and instead engages in conduct which assumes the validity of the [agreement], then the agreement or transaction may be deemed ratified." *Notch View Associates v. Smith*, 260 N.J. Super. 190, 207-208 (Law. Div. 1992). The Court rejects Defendants' allegation that, to the extent Sutton acknowledged the existence of the Guaranties, such an acknowledgments were induced by Everest's fraud. Specifically, Defendants assert that between July 2003 and July 2005, Sutton's continued objections to the Guaranties were met with assurances from Everest that the Guaranties would be rescinded. Sutton Decl. at ¶ 32. Defendants allege that Sutton relied on these assurances in acknowledging the Guaranties in the above referenced documents.

To establish fraudulent inducement, a party must show a "material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by [that party] to [its] detriment." *Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 432 A.2d 521, 524 (1981). Here, Defendants do not allege that the statements made by Everest that the Guaranties would not be enforced were made with the intention of inducing Defendants to ratify the agreements. Moreover, although Defendants baldly claim that "Sutton was relying on [Everest's] promise that the Guaranty would soon be rescinded," Sutton Decl. ¶ 42, this is belied by their own admission that "Sutton acknowledged the existence of the Guaranty because he had no reasonable alternative; if he had not continued to acknowledge the Guaranty, the DPI coverage on billions of dollars of motor vehicle loans would have been in jeopardy. . . . Even after Centrix entered bankruptcy, the DPI coverage on Centrix loans was still necessary to ensure Centrix's obligations to third parties." Sutton Decl. ¶ 40.

Consequently, partial summary judgment shall be entered in favor of Plaintiffs ordering

the Guarantors to post security in the amount set forth in the January 11, 2008, arbitration award.[7]

E.  Everest's Motion to Dismiss

In their first two counterclaims, Defendants seek a declaration that the Guaranties are unenforceable as a result of fraud in the inducement and duress.  In the third counterclaim, Defendants seek a declaration that no monies are due and owing under the Guaranties because Founders is not liable to Everest for certain claims improperly paid by Everest as well as injunctive relief enjoining Everest from taking steps to collect monies from the Guarantors.  Plaintiffs have moved to dismiss all counterclaims.  First, Everest argues that the counterclaims are not properly causes of action but rather are affirmative defenses and should be treated by the Court as such.  Plaintiffs further argue, that regardless whether pled as counterclaims or affirmative defenses, Defendants' claims of fraud and duress fail as a matter of law.

As to the fraud and duress claims, they have been discussed at length above with respect to Plaintiffs' motion for summary judgment.  For the reasons set forth above, the fraud and duress claims fail as a matter of law and shall be dismissed.[8]

In their third counterclaim for declaratory and injunctive relief, the Guarantors state that "[t]he Default Risk Policy provides that Founders could not be held liable if Everest knowingly and voluntarily elected to pay claims on loans that did not meet Everest-required underwriting standards."  Counterclaim ¶32. They then assert that "Everest voluntarily has been paying on loans that it knows did not meet its underwriting standards . . and [f]or those claims voluntarily paid by Everest, Founders is not liable under the Reinsurance Agreement and, therefore, Sutton

---

[7]In light of the Court's decision on the issues above, the Court does not need to reach Plaintiffs' arguments regarding laches and judicial estoppel.

[8]Additionally, Defendants admit that New Jersey does not recognize economic duress as an affirmative tort.  Def. Opp. to Motion to Dismiss at 8.

17

and the Corporate Guarantors cannot be held liable under the Guaranties." Counterclaim ¶ 34.

Everest asserts that these allegations can only constitute a defense to payment under the express terms of Guaranties and, as such, they are improperly plead as affirmative claims. Everest claims that the Guaranties "expressly provide that [the Guarantors'] assertion may only be raised as a defense to payment under the Guaranties and not as an affirmative claim against Everest. Specifically they point to the provision in each Guaranty that provides that the guarantor "may claim <u>as a defense</u> that Founders is not liable to the Company under the Reinsurance Agreement, provided that such defense is predicated upon a claim that the losses ceded are not covered business under the Reinsurance Agreement or are otherwise not yet due under such Reinsurance Agreement." Counterclaim ¶33 (emphasis added). Everest cite no other authority in support of its argument.

Nothing in the Guaranty language relied upon by Everest bars the Guarantors from asserting the claim set forth in the third counterclaim. This counterclaim seeks a judicial declaration of rights and liabilities under a guaranty instrument, and such a claim not prohibited by the Federal Declaratory Judgment Act, 28 U.S.C. §§2201, 2202 or Federal Rule of Civil Procedure 57. Consequently, Everest's motion to dismiss the third counterclaim is denied.

### III. CONCLUSION

For the reasons set forth above, Everest's motion for partial summary judgment is granted, and Everest's motion to dismiss is granted in part and denied in part.

/s/ JOEL A. PISANO
United States District Judge

Dated: August 11, 2008

18